Mr. Wells, you're reserving five? Yes, Your Honor. Okay. Good morning, Your Honors. May it please the court. You know, we talk about trial by ordeal and sometimes the picture of putting an anchor on somebody's ankle and throwing them into the river is a trial by ordeal if they float, they're guilty. If they sink, they're innocent. On page eight of the blue brief. I'm sorry? On page eight of the blue brief, you say, you know, I'll read it to you, unique to the military system, unlawful command influence allows for an unconstitutional taint to permeate the proceedings. That's correct. Unlawful command influence is a crime under the UCMJ, isn't it? Well, actually, Article 37 is not really punitive and it did not provide for a punishment, but there are regulations against it. So by disobeying that regulation, it certainly could be a crime, but Your Honors, I'd remind you that the military. Then how does it allow for an unconstitutional taint? Well, certainly unconstitutional taint if it's performed. And I would remind Your Honor that the military courts have felt that it's not just actual command influence, but actually the appearance of command influence in the military justice system. They need to make sure the optics are correct. And we're not looking here necessarily at throwing somebody in jail for command influence because it could be inadvertent, often is, could be subtle, often is. But in this particular case, it creates an unfairness within the system. Even that appearance creates the unfairness. You say, at the same section, the military judge, perhaps in response to the subtle command influence, flaunted congressional and presidential directives by allowing the information to be placed into evidence. Are we talking, I believe, on the fact that my client, or he was not my client at the time, that the appellant invoked his right to counsel. And that certainly was a situation. Did you file a criminal complaint? No, I would not do that because, Your Honor, number one, I was not representing the gentleman at the time. Number two, I don't think there was any criminal intent there. I think there's a subtle intent. And as we talk about... Well, did you think it was subtle to rush up? You alleged that Lieutenant Colonel Collins rushed up to confer with prosecution counsel. You were there, weren't you? I actually observed that. Yes, sir. I was there for part of that court-martial because I had a... Where's that rushing up in the record? I'm sorry? Where is that rushing up in the record? It deals with, actually, in the clemency portion that was filed, in the clemency document. Yeah. Surely, you must have made an objection when you saw counsel rushing up to confer with the prosecution. Your Honor, again, I wasn't the trial defense counsel, and certainly... I thought you said in your brief you represented another person. I did. I did. But completely separate court-martials. Oh, I see. Different times. I see. If I had been there, yes, I would have made that objection. The major that was defending the case did not, okay? He did raise it in the clemency, and in the military system, the court is not final until such time as has been acted on by clemency. So, it's still within the record and still in a position where it can be raised. You say that, again, that on page 17 of the gray brief, that Lieutenant Colonel Collins was giving advice to the prosecutors in full view of the members. She was. What evidence in the record supports that? Again, I would refer you to the clemency package. I understand. I mean in the trial record. There's none. But as I just said, if the clemency package is considered part of the trial because the conviction is not final until acted on by the convening authority in the military justice system. Am I remembering right that even the full record in front of us, including the clemency record, does not include anything about the content of any of those communications between the... Again, there's no way we could know the content. Your Honor, I would also mention, by the way, this is a summarized record. It's not a verbatim. Right. But, you know, as a matter of her going up and whispering in the ears or handing a piece of paper to the trial counsel, again, if I had been on that particular case, I would have raised that objection. It's the same way with coaching the witness. I have a standard motion I put in court marshals to prevent that, but I wasn't the counsel on that. It was not put in. And we have the situation where a witness's testimony and some pretty critical information was not adding up in the words of the trial counsel. They take her into the back, ex parte, and basically coach her up. But that was examined on the record, right? That was examined on the record. That's correct. And she said... They said, are you sure you're right about the document you've identified? And she looked at it and looked at it some more and said, oh, wrong one. And then she said, here's the right one. Here's the right one. Yes. Judge Toronto, you're right. But you've got to remember, we're looking at officer lawyers talking to, at that time, I think she was an airman basic, so I believe she had been reduced down, under an immunity agreement where if she felt that, if the government felt she was not telling the truth, she could have gone to jail, okay? And actually, she did not go to jail, as it turned out, but she had every incentive to do exactly what the government said. Look, any kind of preparation beforehand, that's fine, that's fair, not a problem. But to take somebody off the stand in the middle of their testimony and go in and say, oh, your story's not adding up, we feel that is a basic deprivation of fundamental fairness, in this case, prosecutorial misconduct, and which rises to command influence. I know I didn't put a criminal complaint in because... Why not? I didn't put a criminal motion in to prevent that, but how am I going to be able to prove that... Well, you're trying to do it here. Well, I am, sir. But don't forget, we only have to show the appearance that we do in the military system. But how can I prove that he was forcing her to lie? Sure, but you only have to show, in the military justice system, you only have to show an appearance of impropriety on the part of the members of the board or others. And that's what we're doing here, sir. We're trying to. I hope we're doing that. Your Honor, the military system is so different, and I recognize that. I was not a JAG, but I was convening authority in the military, and I've done court-martial work since then. But it's where you have, especially the staff judge advocate, and this is where the court below made, I think, a very serious error, said, well, you know, Lieutenant Colonel going up there, that's not command influence because it wasn't the commander. But military law holds that that staff judge advocate acts under the mantle of command. In effect, she's wearing the general stars when she goes up there. And you know, if you take enlisted people or even junior officers, I mean, the major's uniform there can be intimidating. It may not intimidate us, but it would be intimidating to an enlisted person. Lieutenant Colonel Collins was actually one rank higher and wearing the star, effectively wearing the stars of the general. The reason why military courts have put so much emphasis on command influence is because even the appearance, and I think you all agree, perhaps you all agree, that the optics here are not the best for the military. Even the appearance smacks us the mortal enemy of military justice, especially where you've got a charge which is really vague. Again, I was not on that. Really? Yes, sir. What's controlled suspected test material? That's not even in the instruction. I mean, vagueness, I think I'm right about this, vagueness, constitutional vagueness outside the area of the First Amendment, which this isn't, is always vagueness as applied in what was at issue here, though under the auspices of what's suspected test material was actual test material, right? Well, not necessarily. I'm not sure we even knew what material he was alleged to have given. It sure looked like, from the record, like what was being done was the study material was being taken and the parts that were on the test were being highlighted so that the reader would know this is where the question is. That can be done, but there was no, and remember, Your Honor, that one of those supposed transactions was later proved to be completely false and was set aside by the Judge Advocate General. The guy who indicated that he received the material from Mr. Pittman, Sergeant Pittman, wound up creating it himself. What we had here was Airman Basic Trexler saying she gave that material to Sergeant Pittman. We don't know what the material was. His fingerprints weren't on it, hers were, and actually an OSI agent got a little clumsy, his was, and later found out, although not in this record, but in my trial, we discovered that her husband's fingerprints on it, not Sergeant Pittman's. And the problem comes out, what was it? If I write down some questions on a piece of paper myself, and I think this might be what we're looking at, is that suspected test material? Because what we're looking at is anything, basically, that Air Force OSI, I'm sorry? That's not alleged. That's the definition? Your own personal study materials that you write up? Your Honor, I think it is, and I think it's covered under the suspected test material, because basically what it says, anything that the police or the prosecutors say it is. Or a testimony, I'm still trying to figure out what a testimony is, I don't know. I can't find anybody that can tell me that. But it is so vague that if I bought one of the commercial test materials, I'm not Air was, and bought one of those commercial test books, which are free to be purchased, and gave it to somebody as a birthday present, that could come under this statute and come under this instruction. That's why the entire instruction, not the entire instruction, the entire instruction as it looks to this actual controlled and suspected test material has to be set aside  It was improperly charged. There is no such thing as controlled suspected test material. It was improperly adjudicated, and Your Honor, we certainly would have an opportunity if this is set aside and remanded, the Air Force could probably try to do it right. And they would have, still have jurisdiction over him, even though he's retired, and Your Honor, I'm into my rebuttal time. Thank you. Thank you. Mr. Harris? May it please the Court. The Court should affirm the judgment below. Mr. Pittman received full and fair consideration during his special court, excuse me, court marshal, and judge advocate general appellate review. The military justice system did not deprive Mr. Pittman of fundamental fairness such that it impaired his constitutional due process rights, nor did it result in a spectacle or trial or ordeal. If the Court applies the standard that has applied for the last 70 years since Burns and Augenblick and Matias and Bolling and Flute, then this is an easy summary affirmance. That is the standard of review. Mr. Pittman has objected to that and said that there should be de novo review from a collateral proceeding or clear error. Either of those standards apply. The standards that apply are those that were laid down long ago. I will, I'll make one or two points, and. Can you? Sure. I guess I have a couple of specific questions, which I realize are not going to go to your primary argument, which is that even if there were some merit as an original matter in a de novo review form to what we've heard and see in the briefs, we're under an extremely limited standard of review. So I want to put that aside. So the materials that were alleged to have been improperly shared, were they, I know they were charged as suspected test materials, were they actual test materials? They could also be characterized as actual test materials. If you look, for example, at Appendix 1247, testimony of, at that time she was still identified as Staff Sergeant Traxler, even though she was demoted thereafter due to her testimony. It said that she stated that she went to the test. She actually highlighted the test. You know, she went back to her materials and highlighted those materials in her test materials. And so they are the actual test questions. So that's, she gave those to Mr. Pittman? She gave those to Mr. Pittman. And did he then share them with somebody else? Because his receiving, I don't think. It would in fact be a violation of the regulation. It is. To either receive or to give. It's both. Because it's... Was he charged with both? He was charged with both because the suspected test material was, it was, if you look at paragraph 5.9 of Air Force Instruction 36-2605, and you can find that at Appendix Page 183. Real 183? Which way to 183? Oh, sorry. The one that we filed this week. I'm sorry, Your Honor. No, no. That's fine. For confusion about the appendices. It was just a subtraction of three as far as I can tell. Yes. I think that's right, Your Honor. And I think it may be page 180 of the original. If you go there and look at paragraph 5.9, it lists all the types of areas in which you can be, what you are and aren't supposed to do. I mean, it all adds up to, you're not allowed to cheat. I mean, effectively, you're not allowed to give somebody, I mean, it's, I mean, I know I went to UVA undergrad and they had a very strict honor code policy. Effectively, it's an instruction, a regulation that regulates an honor code policy. You don't share test materials. You don't give out test materials. In the record, you can see that the proctors warned over and over again, there were several witnesses who testified that they were warned, don't share this material. You're not allowed to share this material. You're not allowed to receive this material because we want to get an honest assessment of what you as a candidate for promotion can do. That's the whole purpose of this testing. There was a military need for it. What's a test, Pony? I don't know, Your Honor, but I will say, based on Parker v. Levy, Supreme Court decision, it says we don't have to get into the hypotheticals as to what wasn't charged. That wasn't one of the issues that was charged. We have evidence here in appendix page 1246 to 48, 1247 to 49, that we have highlighted test materials. We also have additional test materials that Tech Sergeant Smith was given by Mr. Pittman as well. That's appendix pages 150 and 151. Based on Parker v. Levy, you don't have to go into the hypothetical of what some of the terms mean because this is a term that was testable material. Look, as far as I'm concerned, the core of your argument is when somebody says to an the engine on the fighter before it took off, the answer has to be true. That's the core of everything in the military. Yes, Your Honor. So I mean, I think at the end of the day, they charged him with conduct he did, he cheated, he shared highlighted test material, he received highlighted test material to help him in his promotion that he actually received. He became a Master Sergeant in part because of the information he received from Sergeant Trexler. So based on that material alone, I mean, that demonstrates that this regulation is not void for vagueness. Can you switch over to the one or two points being made about what the staff judge advocate did in the courtroom? Sure. I gather, first of all, that there are two separate arguments. One is that it prejudiced the court members from seeing it, and the second was that he then should not have advised the convening officer. I think that's... Let's talk about the role of an SJA. Yes, Your Honor. The staff judge advocate serves a vital role with the convening authority. They serve several different roles. One, in this circumstance, they assist the convening authority in preparing the materials and deciding whether to take action on the court-martial. Here she did that. Oftentimes, it's almost a pro forma thing. It's just here's the clemency petition. We disagree. We think it's error. Here, convening authority. Now you can assess sometimes the convening... Is the staff judge advocate's role, does that begin before the convening of the court-martial? It does. Does that person always sit through the court-martial? They don't necessarily do so. Sometimes they do. Sometimes they don't. I don't know if it's common or not, but I think it happens sometimes. I'm sure they sit in to see because they're overseeing the JAGs, the judge advocate generals as well. They don't sit on either side, but their job is as a supervisor. They're not only the staff judge advocate, but they're also... They don't sit on either side inside the bar. I gather she did sit on one side. She may have sat... Yes, on one of the courtroom. I mean, I don't think it was quite like a wedding, Your Honor, where you sit with the bride and the groom. I think some of the statements that have been made by counsel, I mean, essentially he's testifying about what happened. There's no allegations in the record as Judge Wallach noted. There's no allegations in the record that any of these things happened. If you look at appendix pages 77 and 78, it says, no one's alleging actual wrongdoing here. At the most, they said that there were notes passed. And that's, again, on pages 77 and 78 of the record. That is a total that they're... Mr. Pittman makes some allegations about coaching and adversarial advice or rushing up to confer. None of that is in the record. That's all counsel's... But you said note passing is in the record. It is. What would be... And this may be... The answer may be something as trivial as, you know, do you want lunch or something. But I mean, is there any legitimate basis for the staff judge advocate to be communicating on any subject with the prosecution team? Absolutely, Your Honor. The staff judge advocate oversees the judge advocate court. Both sides, right? Both sides, correct. So she could be passing to one of them. She's also advising the court. That's common? And she's also advising the court. Are you saying it's common? It is. Is it common for these notes to be passed? And what kind of... Generally. What kind of... What kind of communication? Your Honor, I don't know how common it is for this to happen. I know that there are times when it has been asserted that the staff judge advocate has stepped down and has done certain things far worse than this as prosecutorial misconduct. And we cite some of those cases in our brief, Dowdy for one, where an independent review by the convening authority, even if it's been provided by the staff judge advocate, it's not enough to show prejudice. So that's... So you have circumstances that are much worse, where they do, in fact, they may talk to witnesses, they do things like that. Here, there is no, by the way, there's nothing in the record that they were, that the staff judge advocate was involved in that coaching of the witness. When you say there are cases where staff judge advocates do that, you're not suggesting that that's good behavior? It's not necessarily good behavior, Your Honor. But this is, to me, I think it, first of all- The SJA is acting as a facilitator in effect, is that correct? A facilitator for, what do you mean, Your Honor? For the proceedings of the court. Correct, Your Honor. And here, we don't know what was in those notes, obviously. But my speculation, and perhaps because I represent the United States, my speculation is she was doing her job as their supervisor to say, you know, you're not deporting, you're deportment in the court is not right. For all I know, you know, she could have had a sick relative, though. We don't know, and defense counsel didn't ask what was in those notes. So we don't actually know. She had said, ask this question of the witness, is that? And the court members saw that, and then some question was asked, and it turned out to be a really good question, is that a problem? It potentially could be, Your Honor, but again, you would have to establish prejudice under Article VI of the Code, which is prosecutorial misconduct, because at that point, and again, we cite the Dowdy case, and I may have cited some other cases as well, that essentially show that even if there is something bad there, and even if there is an actual or an appearance of impropriety there, it can be remedied by the convening authority looking at the record independently. Was there a military jury in this case? There was, Your Honor. So, and we will make the argument at some level here that some of these arguments beyond the prosecutorial misconduct allegations with regard to unlawful command influence were waived. The court below, you know, found that it wasn't and went onward, in fact, gave a much larger review than we would have expected under the standard review in this court, and in fact almost looked at this de novo, and still found that there was no unlawful command influence. In the absence of a military jury, are the members of the court permitted to directly question the witnesses? The members of the court? I don't… They are. They are. Yes, Your Honor. But they don't do it in the presence of a jury, isn't that right? So, Your Honor, are you talking about the members in here, the jury itself, or are you talking about the lawyers for the… The members of the court themselves, the people who are actually presiding, the military judge. The military judge. The judge… Or the judge. Yes, the judge can, in fact, ask questions, Your Honor. In front of the jury. In front of the jury, Your Honor. Yes. So, for all the reasons we state in our brief, you know, we believe, again, if the court adheres to the standard of Augenblick, Burns, Boling, Matias, Flute, all of those prior cases generate that there was full and fair consideration of all these issues in the military judgment below should be affirmed. The court has nothing further. We'll rest on our briefs and respectfully request that you affirm the judgment below. Thank you. Your Honor, if I may, not only can the judge ask questions, but the members of the court themselves can ask questions. And Judge Stoll, to answer one of your questions, I've done a number of court martials, probably somewhere around 25 or 30 since I retired. I've seen staff judge advocates come in and go out. There's only been two times that I've ever seen them passing notes. One was National Guard court martial, I was the defense counsel, and I shut that down by objecting the military judge, and the other one was this case. Mr. Wells, were the notes passed only to the prosecution or were they passed to the defense as well? Yes, sir. Only the prosecution. The way that courtroom laid out is kind of funny. It's almost like an L, so you have the prosecution here, and I can't do it for the record. It's like an L, and the defense, they're not close to that. I'm sorry. Just trying to answer the question, Your Honor. But the other thing, and I think this becomes really important, is counsel indicated the clemency is not part of the record. The clemency is part of the record, and until that convening authority acts, it's still really an open trial. We've had cases, you know, theoretically possible, and I've seen cases set aside by the convening authority in whole or in part. It can happen, so when it was raised in the clemency hearing by that defense counsel, it was raised on the record. The uh . . . When it was raised in the clemency, was the answer something about, I guess I can imagine, no? No notes were passed, or . . . There was no answer, sir. No, I mean, no document as in . . . no document is filed to answer? No, sir. That's all they do is there's a one-page document that says everything is proper. We recommend that this take place. There's no real analysis to it. It was the same thing with the Article 69. They did a little bit of an analysis to set aside . . . The defense counsel would say, we don't know the content of the notes, remand it. I don't know if the remand is even a correct term for what the recipient to the clemency request would . . . They could afford what they call a dube hearing, which is effectively a special hearing to study that one issue. That was not done, I believe, in the 69 review that we asked for that. Was it requested? I believe we did in the Article 69 review. I'm not 100% sure, but I thought we did. But, you know, that was not done, and unfortunately, because this didn't go to the Court of Criminal Appeal or the Court of Appeals for the Armed Forces, you're somewhat limited in your remedies. We can't do like we come here and, you know, present to you all and present briefs and responses and so on and so forth. We put it in, it goes into a star chamber, basically, somebody looks at it and makes a decision. So it is a different kind of system. And Your Honors, I think the other issue we didn't really address very much, if I can do that in my last few seconds, is the fact that the publication that Mr. Pittman or Sergeant Pittman was going to invoke counsel, we find is a very serious due process violation. Not because it was a custodial interrogation. I think Judge Braden went off on the wrong track on that because it's irrelevant. It's not the issue of whether warnings should be given. It's the issue of the military court, a manual for court-martial says you do not disclose the fact that there was any invocation of counsel. To us attorneys, that doesn't seem very serious, but to the average people sitting up there, especially military folks, and I was one, so I'm not being critical, but sitting there and saying, hmm, lawyer must be guilty. And that's why the MCM is very specific that you should not do that. And that alone is a basis to remand, to set this aside, remand back to the Air Force where they can do a rehearing or a retrial, they call it a rehearing, if necessary. Your Honors, thank you so much for the opportunity to come before you today. Only nine seconds over my time. I think that's a record. Thanks, Mr. Wells. Nice to see you again. Nice to see you, Judge.